# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF MINNESOTA, ex rel. JULIE SCHARBER, KIRSTEN HAHN, BARBARA SHOEMAKER, and MELISSA FARR, | Civil No.  12-2711 (JRT/SER) |

Plaintiff,

v.

GOLDEN GATE NATIONAL SENIOR
CARE LLC, *doing business as* "Golden
Living Center – Twin Rivers;" GGNSC
ANOKA LLC, *doing business as* "Golden
Living Center – Twin Rivers;" GGNSC
ADMINISTRATIVE SERVICES, LLC;
GPH ANOKA LLC; GGNSC EQUITY
HOLDINGS, LLC, *doing business as*
"Golden Living Center – Twin Rivers;"
GGNSC CLINICAL SERVICES, LLC;
GOLDEN GATE ANCILLARY, LLC;
and AEGIS THERAPIES, INC.

<strong>MEMORANDUM OPINION<br>AND ORDER ON DEFENDANTS'<br>MOTION TO DISMISS</strong>

Defendants.

Ann M. Bildtsen, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for the United States of America.

Gale D. Pearson, **PEARSON, RANDALL & SCHUMACHER, PA**, 100 South Fifth Street, Suite 1025, Minneapolis, MN 55402, for the State of Minnesota.

Gale D. Pearson, **PEARSON, RANDALL & SCHUMACHER, PA**, 100 South Fifth Street, Suite 1025, Minneapolis, MN 55402; and Brian E. Wojtalewicz, **WOJTALEWICZ LAW FIRM, LTD**, Post Office Box 123, Appleton, MN 56208, for relators Julie Scharber, Kirsten Hahn, Barbara Shoemaker, and Melissa Farr.

Robert Salcido and Annisah Um'rani, **AKIN GUMP STRAUSS HAUER & FELD LLP**, 1333 New Hampshire Avenue N.W., Washington, DC 20036; and Alana K. Bassin, **BOWMAN & BROOKE LLP**, 150 South Fifth Street, Suite 3000, Minneapolis, MN 55402, for defendants.

Julie Scharber, Kirsten Hahn, Barbara Shoemaker, and Melissa Farr (collectively "relators") brought this qui tam action pursuant to the Federal False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the Minnesota False Claims Act ("MFCA"), Minn. Stat. § 15C.01 *et seq.*, against Defendant GGNSC Anoka LLC and the related family of companies. They filed their original complaint in October 2012.

Defendant GGNSC Anoka LLC, a Delaware company, holds the Minnesota assumed name "Golden LivingCenter – Twin Rivers" ("Twin Rivers") and is the nursing home licensee registered as a Medicare/Medicaid provider for Twin Rivers. Twin Rivers was a nursing home facility that offered long term and temporary care. The allegations in this case are focused on conduct at Twin Rivers. The other defendants are all Delaware LLCs tied to the Golden Living family of companies (together, "defendants").

The relators are all former Twin Rivers employees. They allege that since Golden Living took over Twin Rivers in 2006, the defendants submitted false or fraudulent Medicare and Minnesota Medicaid claims for services allegedly performed at Twin Rivers. They allege violations of the federal and Minnesota FCAs, as well as retaliation.

In response to an initial motion to dismiss, the relators filed an amended complaint in April 2015. The defendants then filed a second motion to dismiss, in which they argue that the FCA and MFCA claims should be dismissed because the relators did not plead representative examples of specific false claims. They also argue that the FCA claims

should be dismissed because the alleged breaches constitute, at most, violations of Medicare conditions of participation (i.e., mere regulatory violations), not conditions of payment.  The defendants also contend that the claims against Aegis are barred by the FCA's first-to-file rule, because a related action against Aegis is already pending in this district.  Finally, the defendants claim that the relators have failed to allege a successful retaliation claim.

Because the relators have pled their FCA claims with sufficient particularity, the Court will deny the defendants' Rule 9(b) motion to dismiss.  The Court will also deny in part the defendants' motion to dismiss based on Rule 12(b)(6) grounds, although it will dismiss the relators' reverse FCA and MFCA claims because they would result in redundant penalties.  The Court will also dismiss the relators' conspiracy claims because a parent company cannot conspire with its subsidiary.  The Court will dismiss the relators' FCA and MFCA retaliation claims because the relators have not shown that the defendants knew that they were engaging in protected action.  The Court will dismiss claims against GGNSC Administrative Services, GPH Anoka, GGNSC Clinical Services, Golden Gate Ancillary, and GGNSC Equity Holdings, because the relators do not make plausible allegations against those defendants.  Finally, the Court will dismiss claims against Aegis, because those claims are barred by the FCA's first-to-file rule.

## BACKGROUND

## I.    PARTIES AND COUNTS

Relator Julie Scharber is a Registered Nurse ("RN") who was employed at Twin Rivers in Anoka, Minnesota, from 2003 to 2010.  (Am. Compl. ¶ 8, Apr. 3, 2015, Docket

No. 59.)  Relator Kirsten Hahn is a Licensed Practical Nurse ("LPN") who was employed at Twin Rivers from August 2008 to July 2010.  (*Id.* ¶ 9.)  Hahn's duties included responsibilities as the charge nurse/floor nurse for the Transitional Care Unit ("TCU"). (*Id.*)  Relator Barbara Shoemaker is a Certified Nursing Assistant ("CNA") who was employed at Twin Rivers from March 2001 to November 2010.  (*Id.* ¶ 10.)  Shoemaker also worked with Twin Rivers' Medicare and Medicaid billing, and in the Medical Records department.  (*Id.*)  Relator Melissa Farr is also a CNA who was employed at Twin Rivers from September 2007 to July 2010.  (*Id.* ¶ 11.)

The eight properly served defendants can be subdivided into four categories: (1) the five nursing home defendants; (2) one parent company; (3) one therapy company; and (4) one related company tied to the Golden Living Family companies.[1]  (*Id.* ¶¶ 12-24.)  All defendants are Delaware LLCs.  (*Id.*)

### A.    Nursing Home Defendants

The nursing home defendants include: GGNSC Anoka LLC, (*id.* ¶ 12); GGNSC Administrative Services LLC, (*id.* ¶¶ 17, 21); GPH Anoka LLC, (*id.* ¶ 21); GGNSC Clinical Services LLC, (*id.* ¶¶ 15, 21); and Golden Gate Ancillary LLC, (*id.* ¶¶ 16, 21).

GGNSC Anoka LLC is the nursing home licensee registered as a Medicare/Medicaid provider for Twin Rivers.  (*Id.* ¶ 12.)  Twin Rivers was a 56-bed

---

[1] Defendants GGNSC Holdings, LLC and Drumm Investors, LLC were listed in the amended complaint as defendants.  (Am. Compl. ¶¶ 18-19.)  However, since they were not properly served, both parties agree they are not defendants in this case and the docket does not list them as defendants, as a result.  (*See, e.g.*, Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 10 n.1, Feb. 2, 2015, Docket No. 47.)

skilled nursing home facility that offered long term and temporary care. (*Id.* ¶ 22.) It was a certified Medicare and Medicaid provider. (*Id.*) GGNSC Administrative Services LLC collects fees for Twin Rivers and Golden Living management. (*Id.* ¶ 21.) GPH Anoka LLC is the land and building owner which collects mortgage payments. (*Id.*) GGNSC Clinical Services LLC and Golden Gate Ancillary LLC are affiliated goods and service providers who collect payments from Medicare and Medicaid through Twin Rivers. (*Id.*)

At argument, the relators stated that they would be amendable to dismissing claims against four of the five nursing home defendant LLCs: GGNSC Administrative Services, GPH Anoka, GGNSC Clinical Services, and Golden Gate Ancillary. (Mot. to Dismiss Hr'g Tr. ("Tr.") at 30-31, Aug. 4, 2015, Docket No. 69.) As a result, the Court will dismiss the relators' claims against those four defendants.[2]

## B.   Parent Company

Defendant Golden Gate National Senior Care LLC ("Golden Gate") is the parent company of the nursing home defendants. (Am. Compl. ¶ 14.) Golden Gate operates approximately 333 skilled nursing centers (doing business as "Golden Living Centers") in Minnesota and approximately 21 other states. (*Id.*) One of these centers is Twin Rivers. (*Id.*) Golden Gate is owned by Fillmore Strategic Investors LLC, a private real

---

[2] Nevertheless, because the Court will find that the relators can proceed on their claims against GGNSC Anoka and Golden Gate, the relators may need to obtain documents from these related defendants during discovery. Given their relationship to GGNSC Anoka and Golden Gate, the Court does not anticipate that it will be problematic for the relators to obtain documents from these four entities. The Court finds that the relators should have access to needed documents but should not be able to engage in a fishing expedition as to these entities.

estate equity firm.  (*Id.*)  Golden Gate has two affiliates, GGNSC Holdings LLC, and

GGNSC Anoka LLC.  (*Id.*)

### C.      Therapy Company

Defendant Aegis Therapies Inc. ("Aegis") provides occupational, physical, and

other therapy services at Twin Rivers.  (*Id.* ¶ 20.)  Aegis is the largest contract therapy

company in the United States, providing rehabilitation services at more than 1,000

nursing home facilities in 37 states.  (*Id.*)  Aegis is a subsidiary of Golden Gate and is

therefore ultimately owned by Filmore Strategic Investors.  (*Id.*)

### D.      Related Companies

Defendant GGNSC Equity Holdings LLC is a Delaware company whose sole

member (i.e., owner) is Golden Gate.[3]  (*Id.* ¶ 13.)

### E.      Counts

The relators assert the following seven counts:

- Count I: FCA and MFCA count against all defendants, due to false or fraudulent claims submitted to Medicare and Minnesota Medicaid.  (*Id.* ¶¶ 252-58.)

- Count II: FCA and MFCA count against all defendants for violating the anti-kickback statute.  (*Id.* ¶¶ 259-65.)

- Count III: FCA and MFCA count against all defendants for making false claim documentation, including Minimum Data Set ("MDS") forms and certification forms.  (*Id.* ¶¶ 266-70.)

- Count IV: one count of conspiracy to violate the FCA and MFCA against all defendants.  (*Id.* ¶¶ 271-76.)

---

[3] Because the complaint is devoid of any allegations against GGNSC Equity Holdings, the Court will dismiss that defendant as well.  (Am. Compl. ¶¶ 12-13, 215.)

- Count V: FCA and MFCA count against all defendants for reverse false claims (i.e., keeping funds they should have returned).  (*Id.* ¶¶ 277-88.)

- Count VI: FCA retaliation count against all defendants.  (*Id.* ¶¶ 289-93.)

- Count VII: MFCA retaliation count against all defendants.  (*Id.* ¶¶ 294-99.)

- Count VIII: Minnesota statutory retaliation count against all defendants.  (*Id.* ¶¶ 300-06.)

## II.   SUMMARY OF ALLEGATIONS OF FRAUD

Before delving into the parties' legal arguments, it is helpful to recount the relators' extensive allegations in this case, starting with the following summary.  The relators allege that the defendants submitted, or caused to be submitted, false or fraudulent claims to Medicare and Medicaid for services at Twin Rivers.  (*Id.* ¶ 25.)  The relators allege that these acts occurred in connection with:

- claims for physical and occupational therapy services allegedly provided to nursing home residents which in fact were not provided;

- falsely backdated medical records for residents;

- medical records which claimed care was provided when it was not;

- not providing necessary services which unnecessarily prolonged a resident's stay to collect additional Medicare funds;

- electronic Minimum Data Set ("MDS") forms which did not accurately report a resident's clinical condition;

- falsifying documents in anticipation of government survey to portray the facility was in compliance with mandated regulations when it was not;

- failing to provide adequate and qualified staffing to provide care to residents;

- failing to provide requisite services to prevent harm to residents;

- failing to promote the maintenance or enhancement of the quality of life of residents; and

- billing for services that were otherwise not eligible for coverage under Medicare and Medicaid's general exclusion of services that are not "reasonable and necessary."

(*Id.* ¶ 25.)

## III.   OWNERSHIP AND MANAGEMENT PRACTICES

### A.   Intentional Deception of State Surveyors

Before annual surveys, the relators allege that Golden Gate personnel would meticulously review resident medical records. (*Id.* ¶ 73.) During these medical record reviews, the relators observed that gaps in the Medical Administrative Records ("MARs") would be filled in with fabricated information. (*Id.* ¶ 74.) Undesirable entries in the medical charting were whited out, instead of crossed out and initialed by the original author of the entry. (*Id.*) Hahn was outspoken about this impropriety and expressed her views to Twin Rivers management personnel. (*Id.*)

Prior to surveys by state regulators, a group of special nurses from Golden Gate, known as the "CRC," would arrive at the facility and conduct mock surveys. (*Id.* ¶ 76.) The residents thought the mock surveyors were the actual surveyors and would disclose problems at Twin Rivers related to substandard care and services. (*Id.*) Consequently, the relators allege that when the real surveyors arrived, the residents thought the real surveyors were merely conducting follow-up inspections and saw no need to recount the care issues. (*Id.*) The CRC team stayed through the completion of the actual survey, providing additional assistance in an attempt to artificially boost the perception of the facility. (*Id.*)

During the real survey, the residents' MARs and treatment records were made inaccessible. (*Id.* ¶ 75.) Twin Rivers employees were instructed that if a surveyor requested a resident's medical record, the staff person should turn that request over to the

upper management team responsible for medical records.  (*Id.*)  When a request for a record was received, the upper management team would take the medical record into a closed room, where they would remain for an extended period of time before inviting the surveyors in for a supervised review of the record.  (*Id.*)

### B.       Insufficient Funding and Staffing

The relators also allege that Golden Gate established the overarching budgets for Twin Rivers, including its labor budget.  (*Id.* ¶ 78.)  Golden Gate determined staffing levels by preset budgets, rather than the residents' actual needs.  (*Id.*)  As a result, Twin Rivers consistently did not have enough staff working to provide the required level of care to Twin Rivers residents.  (*Id.* ¶ 79.)

In addition, the relators allege that staffing would decrease significantly in the weeks following a regulatory survey.  (*Id.* ¶ 80.)  As noted above, during surveys, the relators contend that staffing at Twin Rivers was artificially increased to "put on a good show" for regulators.  (*Id.*)  Golden Gate increased staffing by bringing in extra nurses, scheduling existing staff to work additional shifts, and assigning some of the relators to work the unit being closely observed by the surveyors.  (*Id.*)  Due to the increased costs associated with this extra staffing, Golden Gate would decrease the post-survey staff to below pre-survey levels.  (*Id.*)  For example, Scharber alleges that, post-survey, she would often be on duty with only one nurse.  (*Id.*)

Furthermore, Golden Gate magnified funding issues by using funding cuts as a punitive measure.  For example, the relators alleged that Golden Gate would cut the facility's budget when staff reported certain issues such as pressure sores that were Stage

II or higher.  (*Id.* ¶ 81.)  They made these cuts despite the fact that such reports were required under Golden Gate's rules.  (*Id.*.)

More specifically, Hahn documented instances where there were not enough staff persons on duty to care properly for all residents.  (*Id.* ¶ 82.)  As an LPN, Hahn's regular duties included checking vitals, charting, performing injections and treatments, communicating with doctors, entering orders, discharging patients, conducting labs, and dealing with other issues as they arose, such as admitting new patients.  (*Id.* ¶ 83.)  The systemic understaffing at Twin Rivers resulted in Hahn taking on additional responsibilities.  (*Id.* ¶ 84.)  In one instance, in January 2009, there were no Trained Medical Aides ("TMAs") on duty and only three nursing aides working.  (*Id.* ¶ 85.)  As a result, in addition to her normal duties, Hahn passed out medication and effectively acted as the floor nurse.  (*Id.*.)  Due to the absence of TMAs, Hahn had to perform these floor duties at least three other times in February and March 2009.  (*Id.*.)  In another instance, in April 2010, Hahn had to perform all her regular duties and pass out medication to all twenty residents in the TCU due to an inadequate number of nurses' aides.  (*Id.* ¶ 86.)  Finally, paperwork was frequently not completed during the night shift.  (*Id.* ¶ 87.)  The day shift nurses were forced to complete all paperwork, resulting in rushed orders.  (*Id.*.)  In March 2009, Hahn alleges that she had to rush to complete "multiple new admit packets and . . . orders," and she consequently complained to her superiors that it was unsafe to fill out paperwork in such a rushed manner.  (*Id.* ¶ 87.)

### C.     Extended Stays Designed to Advance Golden Gate's Revenue Goals

The relators allege that Twin Rivers encouraged longer stays to meet revenue targets.  They allege that Twin Rivers' administrator, Dana Johnson, explicitly stated that one of the facility's business objectives was to increase the length of resident stays in order to meet Golden Gate's occupancy quotas.  (*Id*. ¶ 89.)  Other Twin Rivers managers stated that another business objective was to increase the number of long-term patients at the facility receiving therapy.  (*Id*.)  Indeed, the relators allege that Twin Rivers would even let temporary residents decline in health in order to move them to long-term care beds and avoid losing revenue.  (*Id.* ¶¶ 95-96.)

One example of how these business objectives affected Twin Rivers' care is the TCU.  Occupational and physical therapists worked on-site at the TCU.  (*Id*. ¶ 90.)  They helped TCU residents with Activities of Daily Living ("ADLs"), so that residents could learn the skills needed to return home.  (*Id*.)  While a standard therapist in this role might observe a resident's limitations and develop and implement a plan to manage those limitations, therapists at the Twin Rivers TCU rarely performed those services.

Further compounding these issues and extending resident stays, therapists at Twin Rivers did not provide services on weekends.  (*Id*. ¶ 91.)  Scharber even witnessed therapy charting and documenting done in advance, especially as to services that should have been provided on weekends.  (*Id*. ¶ 92.)  In addition, insufficient staffing meant Twin Rivers CNAs rarely had the time or staff power to assist TCU residents with re-learning to walk and regaining muscle strength.  (*Id*. ¶ 94.)

### D.   False Billing for Services and Otherwise Modified Records

The relators allege that many residents never received any physical therapy from Aegis or received less therapy than was actually billed for Aegis's services.  (*Id*. ¶ 97.) The relators even observed billing for therapy services that residents had refused.  (*Id*.) In still other examples of therapy-related fraud, Twin Rivers would submit claims for therapy services performed by certified therapists, even though the services were actually performed by non-therapist Twin Rivers staff.  (*Id*.)  The relators observed an overarching push within Twin Rivers to keep people in therapy for as long as possible in order to generate additional revenue, even if therapy services were barely performed or not performed at all.  (*Id*. ¶ 101.)  Indeed, the relators repeatedly witnessed Twin Rivers management and/or Golden Gate personnel discussing changing dates on MDS forms in order to improperly obtain additional funds from the government.  (*Id*. ¶ 102.) Shoemaker alleges that she observed a written communication stating that changes to the MDS forms resulted in an additional $34,000 in revenue for a single month.  (*Id*.)

Hahn makes specific therapy-related allegations.  Hahn regularly worked morning shifts between 2008 and 2010 and, during those shifts, rarely observed therapists in the TCU.  (*Id*. ¶ 98.)  Although Hahn knew that there were certain daily therapy exercises, ambulation, and assistance with ADLs that were ordered for residents and within the patient charts, Hahn observed nursing aides, not therapists, perform these activities.  (*Id*.) In addition, Aegis therapists would post above resident beds that certain therapies were to be performed and would subsequently ask Twin Rivers staff to "sign off" that they understood what therapies to perform.  (*Id*. ¶ 99.)  Hahn alleges that Aegis therapists

failed to perform evaluations, witness resident treatment, monitor progress, or facilitate rehabilitation.  (*Id*. ¶ 100.)  Instead, therapists would make conclusory diagnoses or recommendations, such as that "additional treatment was needed."  (*Id*.)  This method ensured that billing for therapy services could continue.  (*Id*.)

### E.    Kickbacks

The relators also make allegations regarding illegal kickbacks.  The relators observed an inappropriate relationship between Twin Rivers and Dr. Robert Sonntag, the Medical Director employed by Twin Rivers and responsible for certain oversight duties. (*Id*. ¶ 107.)  The relators allege that Twin Rivers steered residents and their families to use Dr. Sonntag as their attending physician under the guise of receiving better and timelier care, in part because he was at the facility two to three times a week.  (*Id*. ¶ 108.) This arrangement was lucrative for Sonntag, however, since he billed for his services separately under Medicare Part B.  (*Id*. ¶¶ 108-09.)  The relators claim that Sonntag, in return, would prescribe therapy and hospice services from Aegis and other Golden Living companies.  (*Id*. ¶ 110.)

Relators also allege that Sonntag frequently "snowed" or overmedicated residents. (*Id*. ¶ 111.)  This overmedication led to sleeping and eating issues, along with weight loss and dehydration.  (*Id*.)  While several nurses complained about this practice, Sonntag continued to overmedicate, in large part due to the financial benefit Golden Gate would incur due to medication-related billing.  (*Id*. ¶ 112.)  He would also prescribe lucrative therapies to address issues related to the overmedication.  (*Id*.)  Specifically, the relators allege that one resident was "snowed" in 2008 and 2009 and suffered frequent choking

episodes as a result.  (*Id*. ¶ 113.)  Despite complaints from the relators and others, Sonntag did not alter the resident's diet and instead only prescribed therapy.  (*Id*.) However, the relators claim that the prescribed therapy was charted but never actually provided.  (*Id*.)

## IV.    HARM PREVENTION AND SUBSTANDARD SERVICES

The relators identified numerous instances of poor treatment and subpar operating procedures by the defendants.  These failures either failed to prevent harm or placed residents at great risk of harm.  (*Id.* ¶¶ 115-97.)  Rather than recount each specific allegation in detail, the Court will briefly summarize the allegations here.  The relators' allegations of failure to prevent harm and substandard services include: (1) improper administration of drugs[4]; (2) failure to prevent accidents[5]; (3) failure to prevent pressure sores[6]; (4) failure to prevent infection[7]; and (5) failure to prevent mistreatment.[8]  The relators also allege that the defendants did not provide physician-prescribed treatments to

---

[4] (Am. Compl. ¶¶ 115-19.)

[5] (Am. Compl. ¶¶ 120-23.)

[6] (Am. Compl. ¶¶ 124-61.)

[7] (Am. Compl. ¶¶ 162-76.)

[8] (Am. Compl. ¶¶ 177-78.)

Twin Rivers residents at the proper times or with the proper frequency[9]; did not properly complete clinical health status forms[10]; and did not properly complete 24 hour charting.[11]

## V.    UNNECESSARY TREATMENTS

The relators also alleged that the defendants provided unnecessary treatments to inflate billing.  Specifically, on May 6, 2010, a physician ordered that one resident have his tube feedings discontinued, but Twin Rivers ignored the order and continued to administer medications through the tube until about May 23, 2010.  (*Id.*)  As a result, Twin Rivers fraudulently received more funds due to the unnecessary use of the tube. (*Id.*)  On June 15, 2010, Scharber and Hahn complained to management concerning that resident.  (*Id.*)

## VI.    FALSELY RECORDED AND REPORTED INFORMATION

The relators also allege a systemic process of falsely recording and reporting information to Medicare and Medicaid.  In September 2009, Shoemaker was told by the Twin Rivers administrator – Dana Johnson – to start collecting time cards from providers visiting Twin Rivers for clinical consults.  (Id. ¶ 200.)  Johnson hoped to use this information to increase the amount of RN hours Twin Rivers would report.  (*Id.*)

Shoemaker also alleges that she saw nurse consultants from Golden Gate alter medical records during state surveys and complaint surveys.  (*Id.* ¶ 201.)   These

---

[9] (Am. Compl. ¶¶ 179-90.)

[10] (Am. Compl. ¶¶ 191-95.)

[11] (Am. Compl. ¶¶ 196-97.)

consultants quickly altered faulty records at the time of surveys to ensure that a resident's chart looked complete and captured all of the services the resident had received.  (*Id*.) Additionally, in a separate incident in 2010, Hahn and Scharber submitted a formal complaint to the Minnesota Department of Health regarding the treatment of residents. (*Id*. ¶ 202.)  When Department of Health official Kim Johnson arrived for an on-site investigation, Scharber witnessed several Twin Rivers and Golden Gate employees taking the relevant records into the nursing office before giving them to Johnson.  (*Id*.) Scharber heard one employee tell another that the records had been "fixed."  (*Id*.)

Shoemaker makes other specific allegations.  For example, after an annual survey in January 2010, Twin Rivers was required to provide training to staff.  Although the facility failed to provide one aspect of the training, Shoemaker nevertheless saw Dana Johnson altering records to indicate that the missing part of the training had been covered.  (*Id*. ¶ 203.)  In March 2010, Shoemaker discovered that pharmacy billing logs for PharMerica had not been reviewed for error in over a year.  (*Id*. ¶ 204.)  This meant that many important errors had not been fixed.  (*Id*.)  In May 2010, Shoemaker saw a Golden Gate employee, Marilyn Hoffer, tell an occupational therapist at Twin Rivers to change the dates on two residents' MDS forms so the defendants could collect more revenue for those residents.  (*Id*. ¶ 206.)  Hoffer even memorialized this request in a July 6, 2010 email.  (*Id*.)  Shoemaker also overheard Hoffer tell the Interim Administrator that Twin Rivers would generate significant revenue by re-working MDS forms.  (*Id*.)  In still other instances, Shoemaker witnesses errors in activities documentation.  (*Id*. ¶ 207.) The relators also witnessed discrepancies between various patient forms, and a failure to

enter a treatment plan into the facility's computer system that led to residents not receiving needed care. (*Id.* ¶¶ 208-09.)

## VII.   CLAIMS BILLING

Due to her position as a backup employee in the business office at Twin Rivers from 2008 through 2010, Shoemaker "personally witnessed hundreds of Medicare and Medicaid billings being submitted by Defendants to the federal Medicare program and to the Medicaid program administered by the Minnesota Department of Human Services." (*Id.* ¶ 221.)  Shoemaker also witnessed Twin Rivers management urgently encouraging and seeking out more therapy and other treatments for residents, which would result in revenue. (*Id.*)

The relators provide a representative sample of false or fraudulent billings at Exhibit 5: a Medicare Summary Notice for Resident 18.  The relators claim that the summary notice shows an attempt to illegally obtain reimbursement for "wheelchair management training," even through Resident 18 had come to Twin Rivers with her wheelchair and was already accustomed to using it. (*Id.* ¶ 222; *see also* Original Filing of Am. Compl., Ex. 5, Jan. 15, 2015, Docket No. 41.)  The relators also include copies of Medicaid Cost Reports at Exhibits 6 and 7.  Shoemaker alleges that Freddia Sullivent, who prepared the cost reports, was actually a Golden Gate and not a Twin Rivers employee. (*Id.* ¶¶ 223-26.)

## VIII.   GOLDEN GATE'S INVOLVEMENT

The relators make a number of allegations regarding Golden Gate's involvement in and relationship to fraudulent practices at Twin Rivers.  For example, while working as a backup employee in Twin Rivers' business office, Shoemaker attended many of the weekly telephone meetings with Twin Rivers administrator Dana Johnson.  (*Id.* ¶ 213)  Shoemaker witnessed Golden Gate executives give direct orders to Johnson concerning spending, staffing levels, patient care quality control, and government survey issues.  (*Id.*)  Shoemaker specifically recalls Golden Gate executives stating that Twin Rivers was spending too much money and telling Johnson where to make cuts.  (*Id.*)  She also recalls them directing her as to labor costs and staffing issues, and grilling her on patient care issues.  (*Id.*)  Additionally, as noted above, Golden Gate sent in staff to assist in advance of and during state surveys.  (*Id.* ¶¶ 213-16.)  The relators allege that Golden Gate had knowledge of, or should have known of, the substandard care provided at and fraudulent claims submitted by Twin Rivers.  (*Id.* ¶ 219.)

## IX.   RETALIATION AGAINST THE RELATORS

Finally, the relators allege that the defendants unlawfully retaliated against them for privately, and later openly, voicing their concerns about Twin Rivers.  (*Id.* ¶ 228.)  All four faced criticism and rebuke for complaining about conduct at Twin Rivers and all four were eventually terminated.  (*Id.* ¶¶ 228-51.)

## X.      THIS PROCEEDING

The relators filed their initial complaint on October 24, 2012.  (Compl., Oct. 24, 2012, Docket No. 1.)   The defendants then filed an initial motion to dismiss on December 8, 2014.  (Mot. to Dismiss, Dec. 8, 2014, Docket No. 22.)  The relators filed a motion to file an amended complaint.  (Mot. for Leave to Amend Compl., Jan. 15, 2015), which United States Magistrate Judge Steven E. Rau granted, (Order, Jan. 16, 2015, Docket No. 43).  The relators then filed an amended complaint on April 3, 2015.  (Am. Compl.)

The defendants filed the present motion to dismiss on February 2, 2015.  (Mot. to Dismiss, Feb. 2, 2015, Docket No. 44.).  The United States declined to intervene in this case.  (Notice of Election to Decline Intervention by United States, July 11, 2014, Docket No. 15).   It did file a statement of interest, opposing some of the arguments in the defendants' motion to dismiss, specifically some of the defendants' Rule 12(b)(6) arguments.  (United States Statement of Interest, Apr. 3, 2015, Docket No. 60).

## DISCUSSION

## I.      FCA AND MFCA GOVERNING LAW

### A.      False Claims Act

The FCA includes a qui tam provision to encourage whistleblowers to report fraud.  31 U.S.C. § 3730.  In a qui tam action, a plaintiff may bring a private civil action on behalf of herself and on behalf of the United States government against a defendant who, in violation of 31 U.S.C. § 3729, has submitted false claims to the United States for payment.   The government may choose to intervene in the action, 31 U.S.C.

§ 3730(b)(4)(A), or it may decline to join the action, leaving the qui tam plaintiff as the plaintiff.  31 U.S.C. § 3730(b)(4)(B).

The FCA imposes liability if a defendant (1) "knowingly presents, or causes to be presented, [to a federal official] a false or fraudulent claim for payment or approval," or (2) "knowingly makes . . . a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A)-(B).  The FCA also proscribes conspiring to violate its provisions.  *Id.* § 3729(a)(1)(C).  Liability under the FCA attaches "not to the underlying fraudulent activity, but to the claim for payment."  *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 677 (8th Cir. 1998) (internal quotation marks omitted).

The Eighth Circuit has stated that, to establish a prima facie FCA violation, a relator must show "that (1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."  *United States ex rel. Raynor v. Nat'l Rural Utils. Co-op Fin., Corp.*, 690 F.3d 951, 955 (8th Cir. 2012) (internal quotation marks omitted).

## B.    Minnesota False Claims Act

The relators also bring claims under the MFCA, which makes a "person . . . liable to the state or the political subdivision" if the person, among other things, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or if the person "knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  Minn. Stat. §§ 15C.02(a)(1)-(2).  The MFCA also proscribes conspiring to violate its provisions.  *Id.* § 15C.02(a)(3).

## II.     RULE 9(B) MOTION TO DISMISS

### A.     Standard of Review

The defendants argue that the relators have not stated a claim for fraud with sufficient particularity.  Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The Eighth Circuit has interpreted the term "circumstances" of fraud to include the "time, place and contents of false representations, as well as the identity of the person making the false representation and what was obtained or given up thereby." *Commercial Prop. v. Quality Inns*, 61 F.3d 639, 644 (8th Cir. 1995) (quoting *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982), *adhered to on reh'g*, 710 F.2d 1361 (8th Cir. 1983) (en banc)).  The complaint must read like the opening paragraph of a newspaper article:  it must contain the "who, what, when, where and how" of the alleged fraud. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549-50 (8th Cir. 1997) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).  One of the primary purposes of the rule is to ensure that a defendant can adequately respond and prepare a defense to charges of fraud.  *Greenwood v. Dittmer*, 776 F.2d 785, 789 (8th Cir. 1985).  As a result, "conclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule."  *Commercial Prop.*, 61 F.3d at 644; *Parnes*, 122 F.3d at 549.

The FCA is "[g]rounded in fraud," so claims under it "must satisfy Rule 9(b)'s heightened pleading requirement" that parties "'must state with particularity the circumstances constituting fraud or mistake.'"  *United States ex rel. Roop v. Hypoguard*

*USA, Inc.*, 559 F.3d 818, 822 (8th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)).   Just like a complaint making a traditional fraud claim, a complaint alleging claims under the FCA must also "identify who, what, where, when, and how."   *United States ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

However, "[t]he level of particularity depends on . . . the nature of the case and the relationship between the parties."   *BJC Health System v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007).   "[A]n FCA complaint need not include the 'specific details of **every** alleged fraudulent claim' when a relator alleges that a defendant engaged in a systematic practice or scheme of submitting fraudulent claims."   *United States ex rel. Thayer v. Planned Parenthood of the Heartland*, 765 F.3d 914, 917 (8th Cir. 2014) (quoting *United States ex rel. Joshi v. St. Luke's Hospital, Inc.*, 441 F.3d 552, 557 (8th Cir. 2006)).

When, as here, relators allege such systemic fraud, the complaint need only "provide **some** representative examples of [the defendants'] alleged fraudulent conduct, specifying the time, place, and content of [the defendants'] acts and the identity of the actions."   *Id.* (quoting *Joshi¸* 441 F.3d at 557).   In fact, in some instances, depending on the allegations contained in the complaint, the relators may not even need to plead "**some** representative examples" of the systemic fraud.   *Id*. (agreeing that "*Joshi*'s representative-examples requirement need not be satisfied with respect to some portions of the complaint").

### B.      Rule 9(b) and the Relators' Allegations

The defendants contend that the relators' FCA claims – specifically Counts I through V – should be dismissed under Rule 9(b) because they lack the specificity required under that rule for fraud claims.   Specifically, the defendants argue that the relators have failed to identify "a single false claim that was actually presented to Medicare or Medicaid" for Twin Rivers residents.   (*See, e.g.*, Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 10, Feb. 2, 2015, Docket No. 47.)   To the extent the relators now attach in their amended complaint a Medicare Summary Notice, the defendants contend that the notice is irrelevant because it is not specific enough, is not actually a claim, and is too different from the other allegedly fraudulent claims in the case.   *In re Baycol Prods. Litig.*, 732 F.3d 869, 878 (8th Cir. 2013) (concluding that a complaint was "inadequate to state a cause of action under the FCA because [it] did not include at least some representative examples of false claims").

The defendants also claim that the relators' complaint lacks sufficient indicia of reliability because the relators make no allegation that they had any responsibility over the billing and claims submission process at Twin Rivers.   *See United States ex rel. Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 721-22 (11th Cir. 2012) (finding that although relator asserted that he witnessed some contractual violations, his knowledge of those violations was not enough to demonstrate that the company submitted fraudulent claims based on those contract violations); *see also Thayer*, 765 F.3d at 917-18 (noting that one of the reasons a relator was not required to cite representative examples of false claims is that she managed a facility, oversaw its billings

systems, and was able to plead first-hand knowledge regarding the submission of false claims).

The Court concludes that the relators have met their burden under Rule 9(b). The relators rely on the exhibits to their amended complaint: both the Medicare Summary Notice and the Medicaid cost reports at Exhibits 5-7. The defendants are correct, of course, that those examples are not actual false claims, like a false MDS would be. But they also offer additional, specific detail about the relators' claims that helps to distinguish this case from one in which a relator simply makes a "broad allegation that every claim submitted [from the start of the scheme] until the present is false in order to satisfy the particularity requirement." *United States ex rel. Dunn v. N. Mem'l Health Care*, 739 F.3d 417, 420 (8th Cir. 2014).

In any event, the Court concludes that the relators have met their burden under Rule 9(b) without providing a representative sample of a false claim because they have pled "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Thayer*, 765 F.3d at 918 (internal quotation marks omitted). In *Thayer*, the relator was in charge of two Planned Parenthood clinics in Iowa. *Id.* at 915-16. The relator was able to identify the "who, what, when, where, why, and how" of at least some of the alleged fraud, but did not include any representative samples of fraudulent claims. *Id.* at 916-19. Nevertheless, the Court concluded that, where there is reason to believe the relator would know about systemic fraudulent claims, and where the allegations have sufficient indicia of reliability, a relator making an FCA claim need not include a specific example of a

fraudulent claim. *Id.* at 918 ("Accordingly, we conclude that a relator can satisfy Rule 9(b) without pleading representative examples of false claims if the relator can otherwise plead the particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." (internal quotation marks omitted)).

The court found that the relator had met her burden under Rule 9(b) as to allegations that Planned Parenthood had filed claims for unnecessary quantities of prescription medications that were prescribed but not received by patients and that Planned Parenthood had filed claims for the full amount of services that had already been paid by donations coerced from patients. *Id.* at 919. Specifically, the Court noted that as to those claims, the relator had adequately alleged

> the particular details of these schemes, such as the names of the individuals that instructed her to carry out these schemes, the two-year time period in which these schemes took place, the clinics that participated in these schemes, and the methods by which these schemes were perpetrated. Moreover, she alleges that her position as center manager gave her access to Planned Parenthood's centralized billing system, pleads specific details about Planned Parenthood's billing systems and practices, and alleges that she had personal knowledge of Planned Parenthood's submission of false claims. Thayer's claims thus have sufficient indicia of reliability because she provided the underlying factual bases for her allegations.

*Id.*

As to two other claims, the court found that the relator had not met her burden. As to the allegation that Planned Parenthood was causing other hospitals to submit false claims, the court concluded that her allegations did not carry sufficient indicia of reliability because she did "not allege that she had access to the billing systems of the unidentified local hospitals." *Id.* As to the claim that Planned Parenthood engaged in

"upcoding," the court found that the relator had made only "conclusory and generalized allegations." *Id.* She had "failed to allege when or how often upcoding took place at the various clinics, who or how many physicians engaged in upcoding, or what types of services were involved in the upcoding scheme." *Id.*

As for the specific details of the alleged scheme, the relators provide the detail required in *Thayer*. Specifically, as to their allegations in Counts I and III-V of filing fraudulent claims for reimbursement of wasteful, substandard, or non-delivered care; for making false documentation; for conspiracy; and for reverse false claims, the relators have alleged the names of individuals who carried out or directed these schemes, the time period during which they took place, and participating institutions, and the methods by which the schemes were carried out. *Id.* at 919. Most obviously, relator Shoemaker alleges that Twin Rivers Administrator Johnson effectively directed Twin Rivers employees to order unnecessary therapy and treatment for the purpose of driving up revenue; that this strategy came from the parent company, Golden Gate, and Golden Gate executive Tim Bush; and that pursuant to this culture (which is represented by many other examples of named defendants falsifying records or otherwise attempting to cut costs, drive up revenue, and avoid regulators), specific residents received substandard or non-existent care and Twin Rivers then fraudulently submitted bills for each of these specific instances of substandard care. (Am. Compl. ¶¶ 115-78, 212, 221); *see also United States ex rel. Cairns v. D.S. Med. LLC*, No. 12-4, 2015 WL 630992, at *4 (E.D. Mo. Feb. 12, 2015) ("Here, the . . . complaint includes exhibits which detail specific surgeries for specific Medicare and Medicaid patients in which allegedly false

claims were submitted.  This is more than enough to enable Defendants to prepare an adequate defense.").

The relators make these detailed claims most clearly against GGNSC Anoka, but also clearly tie Golden Gate to this fraudulent scheme, even in one case specifically alleging that a Golden Gate employee, Marilyn Hoffer, fraudulently modified an MDS to increase revenue.  (*Id.* ¶ 206, 212-20.)  The relators make similarly detailed allegations against Aegis.  (*Id.* ¶ 97-102.)  Finally, the relators make sufficiently detailed allegations regarding violation of the FCA's anti-kickback provisions.  (Am. Compl. ¶¶ 103-14.)

While these allegations could be even more detailed, for instance by including the names of more defendant employees responsible for submitting false claims, the relators have nevertheless specifically accused some specific individuals of being liable.  In addition, the relators have made specific and detailed allegations against corporate defendants that can also meet the requirements of Rule 9(b).  *See United States ex rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015) ("The complaint makes clear . . . that corporate levers were pulled; identifying precisely who pulled them is not an inexorable requirement of Rule 9(b) in all cases."); *see also United States ex rel. Johnson v. Golden Gate Nat'l Senior Care, LLC*, No. 08-1194, 2012 WL 465676, at *4-*5 (D. Minn. Feb. 13, 2012) (noting, in denying a Rule 9(b) motion to dismiss, that the relator had made specific allegations about who was to blame for the fraudulent claims by including in their complaint that instructions had been given to her by a corporate defendant, Aegis).  At a minimum, the relators have certainly provided more in their complaint than an FCA complaint that merely makes generalized or conclusory

allegations.  *See, e.g.*, *United States ex rel. Alsaker v. CentraCare Health Sys, Inc.*, No. 99-106, 2002 WL 1285089, at *3 (D. Minn. June 5, 2002).

Assuming that the relators have not provided at Exhibits 5-7 representative samples of fraudulently filed claims, the other question is whether the relators' allegations have sufficient indicia of reliability that lead to a strong inference that claims were actually submitted.  *Thayer*, 765 F.3d at 918.  Here, the relators do not have the same level of inside knowledge as the relator in *Thayer*.  That relator **oversaw** Planned Parenthood's claims and billing process, whereas the relators here did not.[12]  *Id.* at 917.  Nevertheless, relator Shoemaker in this case did work in the billing and business office of Twin Rivers and demonstrates significant knowledge of the inner workings of the nursing home.  (Am. Compl. ¶¶ 212-27.)  She alleges not just generalized allegations, but also that she knows, based on her experience in the office, that "all the residents identified by number [in the complaint] who suffered substandard/deficient care and services never provided, had their billings submitted by Defendants to Medicare or Medicaid programs, or both."  (*Id.* ¶ 221.)  It is also true that Shoemaker does not provide as much detail on the defendants' billing systems and practices as in *Thayer*.  Nevertheless, despite the defendants' attempts to draw one, the court in *Thayer* did not craft a hard line for what constitutes sufficient indicia of reliability.  Indeed, in distinguishing *Thayer* from other similar cases, the court said simply that those cases were distinguishable "because the

---

[12] Of course, although the defendants distinguish *Thayer* by painting the relator in that case as being the senior player in the defendant entity (Planned Parenthood in Iowa), it is important to note that she ran only two of seventeen Planned Parenthood clinics in Iowa. *Thayer*, 765 F.3d at 915, 917.

relators did not have access to the defendants' billing systems and were not able to plead personal knowledge of the defendants' submission of false claims." *Thayer*, 765 F.3d at 917 n.2.   Here, Shoemaker did have access to the defendants' billing systems and has pled personal knowledge of the defendants' submission of false claims.[13]   In sum, combining Shoemaker's indicia of reliability with the relators' specific allegations of fraud, the Court concludes that the relators have met their burden under Rule 9(b) and will deny the defendants' motion to dismiss on those grounds.

## III.   RULE 12(B)(6) MOTION TO DISMISS

### A.   Standard of Review

In reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "'claim to relief that is plausible on its face.'"   *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)).   To survive a motion to dismiss, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'" *Iqbal,* 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). Although the Court accepts the complaint's factual allegations as true, it is "not bound to

---

[13] The defendants argue Shoemaker did not allege personal, first-hand knowledge of the submission of false claims.   However, she claims that based on her experience working in the billing office, she "knows" that the residents identified in the complaint had fraudulent bills submitted on their behalf.   (Am. Compl. ¶ 221.)   That is enough to demonstrate personal, first-hand knowledge of the submission of false claims.

accept as true a legal conclusion couched as a factual allegation." *Twombly,* 550 U.S. at 555 (internal quotation marks omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore must be dismissed. *Id.* (internal quotation marks omitted).

> **B.      The Relators' Claims**
>
> **1.      Conditions of Payment Versus Conditions of Participation**

The defendants move to dismiss the FCA claims in the complaint under Rule 12(b)(6) for a variety of reasons.  First and foremost, they argue that any alleged misconduct amounts, at most, to violations of Medicare and Medicaid regulations (i.e., conditions of participation) and not violations of the conditions a provider must meet to receive payment under these programs (i.e., conditions of payment).  The defendants note that the FCA was not established to merely police regulatory violations, *Dunn*, 739 F.3d at 419, and that the real question is whether the alleged regulatory violation caused the government to pay funds it would not have paid but for the violation, *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 795-96 (8th Cir. 2011) (stating that the FCA is not concerned with mere regulatory noncompliance and instead "serves a more specific function, protecting the federal fisc by imposing severe penalties on those whose false or fraudulent claims cause the government to pay money").  Indeed, the Supreme Court has

repeatedly linked FCA violations to unjustified **payment** by the government and noted that the law is concerned with conduct that "induces the government to disburse funds or otherwise suffer immediate financial detriment."   *Costner*, 153 F.3d at 677 (internal quotation marks omitted).

According to the defendants, none of the misconduct alleged by the relators – including failing to monitor a patient's pain levels, failing to administer topical powder or provide proper skin care, and setting fixed budgets that led to substandard care and unnecessarily high Medicare reimbursements – amounts to the sort of "immediate financial detriment" that means the government would not have paid the defendants but for the defendants' fraudulent actions.   While these actions on the part of a Skilled Nursing Facility ("SNF") participating in Medicare or Medicaid, like Twin Rivers, 42 C.F.R. §§ 483.13-483.70, might constitute violations of the Nursing Home Reform Act ("NHRA"), a NHRA violation is not necessarily a false claim justifying FCA liability. To the large extent that the relators' allegations consist of NHRA violations, the defendants cite *United States ex rel. Atkins v. McInteer*:

> Relator is, in reality, cloaking alleged violations of the Nursing Home Reform ("NHRA") (42 U.S.C. § 1396r) with the hopeful FCA mantle. The essence of this case is a complaint that defendants failed to provide the adequate patient care that is required of them by the NHRA. But, this is not and cannot be an action to enforce the NHRA. . . . Assuming that these defendants, or any of them, failed to comply with the standards set forth in the NHRA and implicitly certified to the Alabama Medicaid Agency that they were in compliance when they were not in compliance when they sought reimbursement for their inadequate nursing care, they did not expose themselves to liability under the FCA, that is, unless they certified that **specific services had been performed when those services had not, in fact, been performed**.

345 F. Supp. 2d 1302, 1305-06 (N.D. Ala. 2004).  The defendants go on to contend that because SNFs like Twin Rivers are paid on a "per patient day" basis, they receive a flat per diem and would not be paid for specific services provided, such that the deficiencies the relators highlight would have resulted in unjustified payments.  *See United States ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 703 (7th Cir. 2014).

The Court is unpersuaded by the defendants' arguments.  The defendants use the terms "conditions of payment" and "conditions of participation" to draw an unnecessarily sharp line between different types of problematic behavior.  Whatever label the defendants wish to apply to the conduct at issue, the relators have properly alleged an FCA violation if they have described deficient conduct that would have been material to the government's decision to provide payment.  *See Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1176 (9th Cir. 2006) (labeling the condition of participation versus condition of payment distinction nothing more than "a distinction without a difference"); *see also United States ex rel. Miller v. Weston Educ., Inc.*, 784 F.3d 1198, 1207-08 (8th Cir. 2015) (in a case arising in the fraudulent inducement context, citing *Hendow* favorably and noting *Hendow*'s rejection of the distinction between conditions of participation and payment).

Moreover, even accepting the defendants' distinction, the NHRA and many of the documents Twin Rivers submitted to the government contained language that effectively tied payment to Twin Rivers to regulatory compliance (i.e., a condition of participation became a condition of payment).  For example, the relators allege that Twin Rivers

submitted fraudulent annual cost reports and MDS forms that, to some extent, bind Twin

Rivers to meeting Medicare or Medicaid conditions of participation.   To the extent

signing such forms and making such authorizations is a prerequisite to receiving

payment, the forms indicate that Twin Rivers' violations of conditions of participation

bleeds into the defendants' definition of conditions of payment.   Additionally, the

language of the NHRA itself shows the difficulty of trying to draw a sharp line between

conditions of payment and conditions of participation.   The NHRA allows the Secretary

of Health and Human Services ("HHS") to deny payments to an SNF if the SNF fails to

abide by the Medicare and Medicaid conditions of participation – effectively making

them conditions of payment.   42 U.S.C. § 1395i-3(h)(2)(B)(i).   Indeed, denial of payment

is **required** by the NHRA if a facility is out of compliance for three months.   *Id.* § 1395i-

3(h)(2)(D).

Eighth Circuit case law does not require a different result.   The Eighth Circuit has

brushed aside the sharp line drawn by the defendants, looking instead to whether the

relator has alleged wrongdoing that was material to payment.   The court labels the

condition of payment versus conditions of participation distinction as a potentially

relevant, but not dispositive, factor in that inquiry.   It also notes that fleshing out whether

a violation is a condition of payment requires an exhaustive examination of the record:

> The FCA is not concerned with regulatory noncompliance.   The FCA
> attaches liability, not to the underlying fraudulent activity, but to the claim
> for payment.   The scope of regulatory requirements and sanctions may
> affect the **fact-intensive** issue of whether a specific type of regulatory non-
> compliance resulted in a materially false claim for a specific government
> payment.   The issue is often complex and may require inquiry into whether
> a regulatory requirement was a precondition to the government payment or
> merely a condition of continuing participation in a government program.

*United States ex rel. Onnen v. Sioux Falls Indep. Sch. Dist. No. 49-5*, 688 F.3d 410, 414-15 (8th Cir. 2012) (emphasis added) (internal citations and quotation marks omitted).

The fact-intensive question before the Court, then, is whether Twin Rivers' communication with the government, whether describing compliance with conditions of participation or not, falsely expressed a quality of care and service that, if the government had known the truth, would have led it to stop paying Twin Rivers. The Court cannot reach a definitive conclusion on that question now, with the record as it stands. Denying the motion to dismiss, however, will not lead to endless and unbounded FCA challenges. The defendants claim that finding for the relators on this issue will mean that even the slightest violation of the NHRA's regulations – including regulations that govern how attractive and palatable food served at a nursing home is – would lead to FCA liability. The Eighth Circuit's decision in *Onnen* implicitly recognizes that such an argument is unavailing. First, the relators allege serious misconduct that goes to the heart of Twin Rivers' bargain with the government. Comparing them to violations of regulations governing the look of food is unpersuasive. Moreover, the fact that this determination is a fact-intensive ones means that, with time and a well-developed record, courts can determine with greater certainty whether regulatory violations amount to conditions of payment in a given case. Courts can then more easily weed out claims that do not hold water, versus those that do.

In sum, at this early stage, without the benefit of the record needed to perform the fact-intensive inquiry called for in *Onnen*, the Court finds that the best course of action is to deny the motion to dismiss as to this argument and let the relators proceed to

discovery.[14]  *See United States ex rel. Johnson v. Golden Gate Nat. Senior Care, LLC*, No. 08-1194, 2015 WL 1040535, at *6-*7 (D. Minn. Mar. 10, 2015) (concluding that the issue of whether regulatory compliance is material to the government's decision to pay a provider is fact-intensive, thereby refusing to dismiss allegations that the defendants violated the FCA by failing to properly document therapy services).

## 2.      Worthless Services

The defendants also contend that the relators' allegation that the defendants' services "were wholly or partially worthless," (Am. Compl. ¶ 57), fails because worthless services claims require service that "is so deficient that for all practical purposes it is the equivalent of no performance at all," *United States ex rel. Roop v. Hypoguard USA, Inc.*, 559 F.3d 818, 824 (8th Cir. 2009); *see also Absher*, 764 F.3d at 710 (noting that a "diminished value" theory does not satisfy the worthless services standard and stating that "[s]ervices that are 'worth less' are not 'worthless'").

The Court rejects this argument as well and finds no deficiency in the relators claims based on whole or partially worthless services.  *See, e.g., United States ex rel.*

---

[14]  The parties and the United States also dispute whether the existence of a robust administrative regime for nursing homes (i.e., the NHRA and its survey process that sends Centers for Medicare & Medicaid Services ("CMS") regulators into nursing homes) forecloses FCA liability.  The Court finds that, to the extent the defendants claim that a regulatory scheme creates a per se bar on FCA liability, they are wrong.  *See Onnen*, 688 F.3d at 415 ("But none of these cases has held that a complex regime of regulatory sanctions **precludes** the Attorney General from suing under the FCA when the government has been damaged by a materially false or fraudulent claim for payment or by use of a record or statement in a materially false claim. We agree with the government that Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud." (internal quotation marks omitted)).  To the extent this argument is simply another iteration of the defendants' contention that the relators are only alleging non-actionable violations of conditions of participation, the Court, as already noted, rejects that argument.

*Academy Health Ctr. v. Hyperion Found., Inc.*, No. 10-552, 2014 WL 3385189, at *42-*43 (S.D. Miss. 2014) ("[C]ourts have recognized that worthless services claims under the FCA are not, as a legal matter, limited to instances where no services at all are provided.  A service can be worthless because of its deficient nature even if the service was provided.").  Given the underlying purpose of the FCA to protect the federal fisc, it makes good sense that the statute would protect the government from paying for significantly deficient, even if not entirely non-existent, services.  *Id.* at *44 ("As the Government has indicated compellingly, taken to its extreme, defendants' argument is that a nursing home is entitled to payment for doing nothing more than housing an elderly person and providing her with just enough bread and water for short-term survival, even in conditions of filth, mold and insect infestation; and even if it consistently provides her too little medication, or too much, or the wrong medication, contrary to her physician's orders; and even if it allows her to develop horrific pressure ulcers infected by feces and urine to the point that amputations are required; and even if it permits her to suffers falls and fractures; and even it allows her to asphyxiate on her own fluids due to inadequate resources to properly attend to her worsening condition.  This cannot be the case and it is not the law.").  To the extent that an out-of-circuit case like *Absher* reaches the opposite determination, the Court finds its reasoning and conclusion unpersuasive.

It is true that that *Roop* states a stringent "worthless services" standard, *Roop*, 559 F.3d at 824-25, but that case is distinguishable.  *Roop* dealt with a deficient medical product (blood glucose monitoring systems) and not deficient care.  The application of the worthless services standard is not necessarily the same in both contexts.  In

articulating its stringent worthless services standard, the court in *Roop* quoted *Mikes v. Straus*, another case involving a defective medical product: poorly calibrated spirometers. 274 F.3d 687, 703 (2d Cir. 2001). As the court in *Hyperion* noted, the reasoning of *Mikes* operates slightly differently when applied in the nursing home context, where the service being provided is care to residents. *Hyperion*, 2014 WL 3385189, at *43. It is possible in the nursing home context to allege worthless services where care is provided, but the care falls significantly below the standard of care expected. *Id.* That substandard care is the equivalent of the defective product, just as much as if no care was provided. Care that is provided, but that is substandard, is roughly as useful as a product that does not work.

The fact that the standard would work slightly different in these two factual contexts makes sense. From a regulator's standpoint, it is easier to imagine products, like glucose monitors, existing along a black-and-white, works-or-does-not scale. A product might not work properly all the time, and there may be issues with it, but the product must be effectively unusable before FCA liability might arise. Indeed, Congress would want to avoid allowing any medical provider who had a bad experience with a product to file an FCA claim. In *Roop*, for example, the only allegation against the blood glucose product was that, **when misused**, it "resulted in serious adverse consequences." *Roop*, 559 F.3d at 824. Nursing home services – direct care to elderly patients and residents – are more nuanced and complex and it is more difficult to assess what is worthless service, and what is not. As a result, a less stringent standard – one that allows for liability when a provider seeks reimbursement for seriously deficient care, even if that care is not

completely worthless – makes good sense.  In sum, the Court finds that the relators have alleged plausible worthless services claims.[15]

### 3.   Reverse FCA Claims

The defendants also seek dismissal of Count V, the relators' reverse FCA claims, arguing that any reverse FCA allegations should be dismissed because they are too speculative.  The FCA's reverse fraud claim provision precludes the fraudulent retention of funds owed to the government.   31 U.S.C. § 3729(a)(1)(G); *see also* Minn. Stat. § 15C.02 (same).  The defendants cite *United States v. Q International Courier, Inc.*, 131 F.3d 770, 772-73, (8th Cir. 1997), which dealt with reverse FCA allegations.  That case held that the United States or a relator must show that the government

> was owed a specific, legal obligation at the time that the alleged false record or statement was made, used, or caused to be made or used.  The obligation cannot be merely a potential liability:  instead, in order to be subject to the penalties of the False Claims Act, a defendant must have had a present duty to pay money or property that was created by a statute, regulation, contract, judgment, or acknowledgement of indebtedness.  The duty, in other words, must have been an obligation in the nature of those that gave rise to actions of debt at common law for money or things owed.

*Id.* at 773; *see also Vigil*, 639 F.3d at 801-02.

The relators respond that Congress's revisions to the reverse FCA claim provision in 2009, as a part of the Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21 (2009), renders cases like *Q International* inapposite and lowers the bar for reverse

---

[15] The Court also rejects the defendants' argument that the relators have made less specific or substantial allegations about substandard care than in *Hyperion*.  The relators have made a host of detailed allegations about grossly substandard care at Twin Rivers, and the effect of that care.  (Am. Compl. ¶¶ 115-78.)  These allegations are enough to constitute a worthless services claim at this stage.

FCA claims like those presented in this case.  Instead, all that is required is the knowing retention of an overpayment of government funds.  *See United States v. Lakeshore Med. Clinic, Ltd.*, No. 11-892, 2013 WL 1307013, at *4 (E.D. Wisc. Mar. 28, 2013) ("Relator also states a plausible claim for relief under the amended false claim provision of the FCA for overpayments withheld after May 20, 2009.  If the government overpaid defendant for [] services and defendant intentionally refused to investigate the possibility that it was overpaid, it may have unlawfully avoided an obligation to pay money to the government.").

The relators are correct that the 2009 FCA revisions broadened the reach and scope of a reverse FCA claim.  Still, the congressional record also indicates that Congress wanted the obligation to pay the government to be more than hypothetical.  155 Cong. Rec. S4539 (daily ed. Apr. 22, 2009) (statement of Sen. Kyl) ("Obviously, we don't want the Government or anyone else suing under the False Claims Act to treble and enforce a fine before the duty to pay that fine has been formally established.").  In this case, before the government has actually levied any fines or demands for repayment, the Court finds that allowing reverse FCA claims here would be too speculative.  The relators note that the 2009 FCA amendments were specifically crafted to encompass overpayments by the government.  S. Rep. 111-10, at 13-15 (2009).  But receiving an overpayment from the government and intentionally keeping it is different from fraudulently obtaining the payment in the first place.  Finding the defendants liable under a reverse FCA theory based on these claims would amount to double punishment for the same allegedly wrongful act: submitting fraudulent, false claims to the government.  *United States ex rel.*

*Ruscher v. Omnicare, Inc.*, No. 08-3396, 2014 WL 2618158, at *28 (S.D. Tex. June 12, 2014) ("[T]he Reverse False Claims Act's purpose was not to provide a redundant basis to state a false statement claim . . . ." (internal quotation marks omitted)).   The Court finds that the Reverse FCA, even incorporating the 2009 amendments, is not meant to reach such a result.   Consequently, the Court will dismiss the relators' reverse FCA claims.   Additionally, because the FCA and MFCA are almost identical and are interpreted the same way, *Thayer*, 765 F.3d at 916 n.1, the Court will dismiss the relators' reverse MFCA claims.

### 4.      Conspiracy Claims and Corporate Parent Liability

Finally, the defendants very briefly argue that the relators' conspiracy allegations should be dismissed because related corporate entities cannot conspire with each other. *United States ex rel. Rector v. Bon Secours Richmond Health Corp.*, No. 11-38, 2014 WL 1493568, at *12 (E.D. Va. Apr. 14, 2014) ("[T]he Named Defendants are legally incapable of conspiring with each other because they are related entities or subsidiaries.").   The defendants also argue that claims against the corporate defendants should be dismissed because the relators fail to allege sufficient allegations against Golden Gate or the other companies that are related to GGNSC Anoka.   *United States ex rel. Lisitza v. Par Pharm. Cos.*, No. 06-06131, 2013 WL 870623, at *5 (N.D. Ill. Mar. 7, 2013) ("It has been established that merely being a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation." (internal quotation marks omitted)).

The Court finds that the relators have made sufficient allegations against Golden Gate to allow its claims against the parent company to go forward.  The relators have made specific allegations of wrongdoing as to employees of the parent company, including that one Golden Gate employee fraudulently modified an MDS form. Moreover, the relators have alleged a level of control by the parent company over the culture, policies, and decision-making at GGNSC Anoka that Golden Gate can be held liable under a veil-piercing theory.  In other words, the relators have succeeded in plausibly alleging, at least at this stage, that Golden Gate "so dominated the subsidiary corporation as to negate its separate personality."  *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 60 (D.D.C. 2007); *see also id.* at 60-61 (internal quotation marks omitted) ("[M]erely being a parent corporation of a subsidiary that commits a FCA violation, without some degree of participation by the parent in the claims process, is not enough to support a claim against the parent for the subsidiary's FCA violation." (internal alterations and quotation marks omitted)).  Beyond Golden Gate, the Court has already found that the relators have made sufficient allegations against the key defendant, GGNSC Anoka, and Aegis.  As to the defendants' concerns about other corporate affiliates, the Court has already indicated that it will dismiss the remaining five corporate defendants.

As for the conspiracy claims in Count IV, the defendants rightly note the substantial precedent that holds that a parent company and subsidiary/affiliated companies cannot conspire with each other.  *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 39 (D. Mass. 2000) ("Ownership – even total

ownership – of a corporation does not by itself impart the corporation's liabilities to the owner, and that rule is not abated simply because the owner happens to be another corporation.").  Tellingly, the relators do not address this argument in their opposition brief.  Given the clear precedent on point, the Court will dismiss Count IV, and the FCA and MFCA conspiracy claims contained therein, entirely.

## IV.   RULE 12(B)(1) MOTION TO DISMISS

The defendants also briefly argue that the FCA's "first-to-file" rule bars the relators' FCA claim against the therapy company Aegis, because similar claims were made against Aegis and are continuing to be litigated in the *Johnson* case.  (*United States ex rel. Johnson v. Golden Gate Nat'l Senior Care, LLC*, No. 08-1194, Am. Compl. ("*Johnson* Am. Compl."), May 8, 2014, Docket No. 178); *see also* 31 U.S.C. § 3730(b)(5) ("When a person brings an action under this subsection, no person other than the Government may intervene or bring a related action based on the facts underlying the pending action."); *United States ex rel. Sandager v. Dell Mkt., L.P.*, 872 F. Supp. 2d 801, 807 (D. Minn. 2012) ("The majority of courts interpret § 3730(b)(5) to bar a later allegation which states all the essential facts of a previously-filed claim, . . . even if the later claim incorporates somewhat different details." (internal quotation marks omitted)).

The Court finds that allegations against Aegis in both cases are sufficiently similar to bar the relators' therapy-based claims against Aegis under the FCA's first-to-file rule. In *Johnson*, the complaint alleges that

> Defendants submitted hundreds of claims for payment to Medicare that were false claims because the claims included charges for therapy services that were not reimbursable by Medicare.  These claims were not reimbursable because they were not skilled services, the services were provided by unsupervised therapy assistants or by personnel who were not qualified to provide physical therapy services, there was no documentation of the services, and, in some instances, because the services were not provided at all.

(Johnson Compl. ¶ 30.)

> In this case, the relators make similar allegations against Aegis:

> Relators observed that many residents, like Resident 12, never received any physical therapy or received less therapy than was actually billed. . . . Defendants submitted or caused to be submitted false claims to Medicare for alleged therapy services provided by physical or occupational therapists, which in fact may have been provided by Twin Rivers staff that were not trained or supervised in accordance with the law, regulations, and program instructions governing Medicare claims.

(Am. Compl. ¶ 97.)

These allegations are essentially the same.  The relators point out that the two complaints are targeting different facilities.  However, the complaint in *Johnson* also clearly alleges a pattern or practice at "eight other skilled nursing facilities in Minnesota." (*Johnson* Am. Compl. ¶ 31.)  Moreover, as the Eighth Circuit has noted, the latter complaint barred under the first-to-file rule "need not rest on precisely the same facts as a previous claim to run afoul of this statutory bar."  *United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 516 (6th Cir. 2009) (internal quotation marks omitted). Given the similarity of the allegations in the two complaints, and the fact that the first complaint specifically alleges that Aegis was engaging in similar conduct at other SNFs in Minnesota, the Court is satisfied that "the Government is put on notice of its potential fraud claim, [and that] the purpose behind allowing qui tam litigation is satisfied."

*Sandager*, 872 F. Supp. 2d at 807.  The Court will consequently dismiss the relators' claims against Aegis.

## V.    RETALIATION CLAIMS

Finally, the defendants seek dismissal of the relators' FCA and MFCA retaliation claims.   To establish an FCA retaliation claim under 31 U.S.C. § 3730(h), a whistleblower must show that

> (1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity.

*Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004).  The text of the MFCA retaliation provision, Minnesota Statute § 15C.145, is substantially similar to the federal corollary, 31 U.S.C. § 3730.

The defendants argue that the relators have failed to show either of the first two elements.   First, the relators were investigating regulatory noncompliance, which the defendants claim is different from fraudulent activity.  *Absher*, 764 F.3d at 715 (noting that while a relator may have concerns regarding the quality of care, raising those concerns is different than investigating actual fraud).  Second, the defendants had no idea the relators were engaging in protected conduct, since all they did was offer concerns and suggestions, not "threats or warnings of FCA litigation."  *United States ex rel. Parks v. Alpharma, Inc.*, 493 F. App'x 380, 389 (4th Cir. 2012).

The Court will grant the defendants' motion to dismiss.  Even if the relators were engaging in protected activity, they have not shown that their "employer had knowledge

- 44 -

[they had] engaged in protected activity."  *Schuhardt*, 390 F.3d at 563 (internal quotation marks omitted).  Courts have repeatedly noted that, in order to show that an employer had knowledge, the whistleblower must show that she was explicit with the employer about her suspicion that the employer was engaging in illegal or fraudulent activity.  *See, e.g.*, *Mikes v. Strauss*, 889 F. Supp. 746, 753 (S.D.N.Y. 1995) ("[A]n employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a *qui tam* action against it.").

In *Schuhardt*, the Eighth Circuit found that the employee had made her employer aware of her actions by specifically telling her employer that its billing practices were "fraudulent and illegal."  390 F.3d at 568; *see also United States ex rel. McKenzie v. BellSouth Telecomm., Inc.*, 123 F.3d 935, 944-45 (6th Cir. 1997) (stating that a whistleblower could inform his employer of his suspicions by using the terms "illegal," "unlawful," or "qui tam action," showing the employer a news story about similar fraud being conducted at a similar company that resulted in qui tam litigation, or engaging in investigation activities outside the scope of his employment).  Similarly, in the Ninth Circuit case cited in *Schuhardt*, the court found that the employee had made her employer aware when, on a recommendation from the employer's in-house attorney, she lodged a complaint with the company's head of ethics, which spurred an investigation into possible fraud.  *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 847 (9th Cir. 2002).

Here, the most the relators did was complain to the managers about subpar care and, in one instance, state that "These [patients] are paying for care that is not being done!"  (Am. Compl. ¶ 243.)  One relator also lodged a complaint with the Minnesota Department of Health, but the relator has not shown that the defendants were aware that she filed a complaint.  In none of these examples did the relators use the words "fraud," "illegal," or "qui tam."  Nor did they lodge a formal complaint internally, or engage in conspicuous investigations beyond their areas of responsibility.  Their actions were not enough to put the defendants "on notice that [they were] either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government."  *Schuhardt*, 390 F.3d at 568 (internal quotation marks omitted).  As a result, the Court will dismiss Counts VI and VII.[16]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that the defendants' Motion to Dismiss [Docket No. 44] is **GRANTED in part** and **DENIED in part**.

---

[16] In a footnote, the defendants also briefly allege that the relators' non-MFCA state retaliation claims, under Minnesota Statute § 181.932, are barred by a two-year statute of limitations.  The defendants cite an abrogated version of *Ford v. Minneapolis Public Schools*, 845 N.W.2d 566, 568 (Minn. Ct. App. 2014), and do not address the court's subsequent conclusion that an "action under Minn. Stat. § 181.932, subd. 1(1), is an action 'upon a liability created by statute" to which the "six-year statute of limitations under Minn. Stat. § 541.05, subd. 1(2) applies."  *Ford. v. Minneapolis Pub. Sch.*, 857 N.W.2d 725, 730 (Minn. Ct. App. 2014).  The relators appear to be asserting their whistleblower claims under Section 181.932, subd. 1(4), but it does not appear that that distinction makes a difference under *Ford*.  In any event, as the relators noted at argument, the initial complaint was filed on October 24, 2012, which is less than two years after the terminations of Scharber and Shoemaker.  Given the recent revised opinion in *Ford*, the Court will deny the defendants' motion to dismiss the state retaliation count on statute-of-limitations grounds.

1.      The motion is **GRANTED** as to the relators' claims against GGNSC Administrative Services, GPH Anoka, GGNSC Clinical Services, Golden Gate Ancillary, and GGNSC Equity Holdings.  Those claims  are **DISMISSED without prejudice**.

2.      The motion is **GRANTED** as to the relators' claims against Aegis Therapies.   Claims against Aegis Therapies are **DISMISSED with prejudice**.

3.      The motion is **GRANTED** as to the relators' FCA and MFCA conspiracy claims [Count IV].  Those claims are **DISMISSED with prejudice**.

4.      The motion is **GRANTED** as to the relators' reverse FCA and MFCA claims [Count V].  Those claims are **DISMISSED with prejudice**.

5.      The motion is **GRANTED** as to the relators' FCA and MFCA retaliation claims [Counts VI and VII].  Those claims are **DISMISSED with prejudice**.

6.      The motion is **DENIED** in all other respects.


DATED:   September 29, 2015                    s/ John R. Tunheim
at Minneapolis, Minnesota.

                                            JOHN R. TUNHEIM
                                            Chief Judge
                                            United States District Court